# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

ANGIE SCOTT-BENSON                          CIVIL ACTION

VERSUS                                      NO:    18-00056

KBR, INC.                                   SECTION: "KWR"

## ORDER & REASONS

Before the Court is Defendant **KBR, Inc.'s** ("KBR" or defendant") **Motion for Summary Judgment (R. Doc. 53)** seeking dismissal of Plaintiff Angela "Angie" Scott-Benson's ("Benson") claims. Benson opposes the motion. Rec. doc. 63. The Court heard the arguments on the briefs on October 16, 2019.

### I.    Factual Summary

KBR is a global engineering, construction and services company that supports the energy, hydrocarbon, power, industrial, civil infrastructure, minerals government services and commercial markets.[1] KBR and Benson first became acquainted when she worked as a subcontractor on KBR's Pascagoula, Mississippi Project. Benson Depo. I at 14-15, 82.  Exhibit A, Rec. doc. 53-4. It was at the end of the KBR Pascagoula project that one of two KBR site HSE managers offered her a position as a KBR HSE Inspector.

After completing the hire-in requirements, which included drug testing, safety testing, background checks, submission of a field application, completion of initial paperwork, and receipt of policies, Benson began working for KBR. *Id.* KBR has a prohibited working relationships'

---

[1] Statement of Undisputed Facts No.1.

policy that prohibits relationships between managers and employees, KBR employees and subcontractors and vendors, and employees responsible for auditing or checking work output quality. Rec. doc. 53-10, Exhibit C-3.

Benson's first official project for KBR, as a KBR employee, began on January 2014 on the Waggaman Project. Rec. doc. Ex. C-6, Personnel Action Notice. The Waggaman Project lasted three (3) years from August 2013 through November 2016. Benson admittedly pursued relationships with married men, Jonathan Voss ("Voss") (Waggaman site KBR Piping Superintendent) and Randy Whitten ("Whitten") (KBR Pascagoula site employee) while working on the Waggaman Project. Benson Deposition 53-5, p. 216 and 219.

Johanna Van Greunen the wife of Jonathan Voss reported to the KBR COBC's Hotline that Benson was having an affair with her husband. The affair lasted almost two (2) years from June 2014 to February 11, 2016. Van Greunen Affidavit, Rec. doc. 53-17. Benson was disciplined for her affair with Whitten and was removed from the work site for three weeks. Benson Deposition, Rec. doc. 53-7, p.194.

Benson also routinely bought gifts for men in the work place, she would go to dinner with them and even accepted jewelry and gifts from her male coworkers. Benson Deposition, Rec. doc. 53-5, p. 214-19. One of the men that she cultivated a friendship with but denied being romantically involved with was Wayne Johnson. Johnson, Benson's "forever friend", was also married. *Id.*

 Benson also admitted that she met her second husband, James Bell (KBR Deputy Commission Manager) while on the job and that they became good friends.  She admitted that they went to dinner but did not have relations until the end of the project and got married just four (4) months after they began dating. Benson deposition, Rec. doc. 53-5, p. 217.

In November 2015, Benson's male and female coworkers reported to KBR's Ethics Hotline concerns that Benson was in a relationship with her manager, Danny Geisinger ("Geisinger"). They also complained that Benson was receiving favorable treatment due to her relationship. In December 2015, KBR commenced an investigation of Benson and her supervisor Danny Geisinger.

During that time, Benson also learned that other coworkers were complaining about her relationship with her boss. Benson denied that she was involved in an inappropriate relationship with her manager but testified that she was given certain privileges, like taking her drug test before others, being provided notice of random drug tests, given a key to his office, and she allowed him to give her an injection in her hip. Benson deposition, Rec. doc. 53-5, p. 187, 191-93. She acknowledged that on one occasion she hugged him but stated that it was because she was going to be tested for suspected breast cancer. Rec. doc. 53-5, p. 189. KBR could not confirm that there was an affair, but it was found that based upon the conduct both she and Geisinger admitted to engaging in, that her actions perpetuated the perception that she and her manager were involved in an intimate relationship.

As a result of the investigation, Benson and Geisinger were both written up and advised that their workplace conduct should change. KBR Contact Form, Rec. doc. 53-6, Exhibit 7. Specifically as to Benson, she was: (1) required to take appropriate steps to help remove perceptions that she was working in a unprofessional manner; (2) advised against having inappropriate relationships with any employees; (3) advised against lengthy time between closed doors; (4) prohibited from having access to Geisinger's computer files and; (5) prohibited from making future requests for injections while on the project premises. *Id.*

After counseling, Benson continued to work for KBR for another eight months through the end of the Waggaman Project in November 2016. Although Benson signed the written counseling form, she disputed the allegations of the elicit sexual relationships and thereafter sought treatment for emotional distress. She continued to report to Geisinger, the HSE manager, until the end of the Waggaman Project and received four (4) pay raises during her tenure. Benson Dep. I, Rec. doc. 53-5, p. 73.

On March 12, 2016, Benson filed her first EEOC charge contending that KBR's investigation of the rumored affair with her supervisor was sexual harassment and retaliation for an alleged Health Insurance Portability Accountability Act ("HIPAA") violation. She complains that after notifying her employer that she was being treated for emotional distress regarding the rumors, her manager wrote her up for being late, which she characterizes as retaliation. Benson indicated that she reminded her manager that she was due a verbal warning before being written up in compliance with the policy. *Id.*

In June 2016, Benson learned that the project she was working on would come to an end; so, she began inquiring and applying for work at other job sites. Even though she applied for work with the company KBR throughout the country, on November 1, 2016, she received a "reduction of force" notice. She complains that her male counterpart Tim Byrd, a fellow HSE Inspector, did not receive such a notice. Complaint, Rec. doc. 1.

On November 29, 2016, HSE and Project Management approved two HSE inspector positions for the La Porte, Texas Project site. Declaration of Janet Curfman, Rec. doc. 53-9, p. 3. Azahel Benito Luna was hired on one requisition but did not start until February 1, 2017 and Paul Jolicouer was hired on the other requisition. *Id.*

In December 2016, Benson learned about an opening at the Texas site. It was well known that the La Porte Project was experiencing some safety incidents, included a recordable injury in October 2016. In addition, the HSE manager suffered some medical setbacks and Senior HSE Inspector, Curtis Carethers, had to fill in as interim HSE Manager. Rec. doc. 53-12. Benson alleges that while her application was pending, KBR HSE manager Keith Kluger ("Kluger") learned of the newly created position requisitioned by Tom Guidry. Kluger cancelled the requisition two weeks later. Due to the safety problems at the La Porte Project site, Kluger was required to improve the safety statistics. He was also responsible for improving HSE recruiting, hiring, and management on the project. Affidavit Keith Kluger, Rec. doc. 53-12.

Benson alleges that she relocated to Texas only to find out that she did not have the job. She later learned that the job was given to a male, Jonathan McCaskill. Thereafter, Benson filed her second EEOC charge on May 27, 2017 complaining that KBR's failure to hire her for the La Porte position was in retaliation for her having filed the earlier EEOC charge in March 2016 and constituted sex discrimination.

KBR has filed the subject motion seeking dismissal of several of Benson's claims. First, KBR contends that Benson's unexhausted claims are not actionable. KBR also alleges that her claims of sexual harassment and retaliation fail as a matter of law. KBR's failure to hire her on the La Porte project and retaliation are not actionable because she was not qualified for the position; the position was not filled; and there was no adverse action. Finally, KBR contends that there is no evidence that KBR's reason for not hiring her was pretextual.

Benson opposes the motion. Benson points out that she is not asserting a claim of managerial discrimination that a male coworker was retained a few days longer than she on the closing of the Waggaman Project but that the fact can be used as background evidence. Rec. doc.

63. Benson further contends that the basis of her first complaint are the false accusations her co-workers began making against her about engaging in inappropriate romantic relationships on the job, after she complained about alleged HIPAA violations. *Id.*

Benson further contends that Guidry was hiring her for a commissioning job as a CSS Safety Coordinator, and not an HSE inspector, which he had the authority to do. Benson acknowledges that she did not plead a claim for intentional infliction of emotional distress but contends that the pleadings asserts facts establishing her entitlement to such relief. Benson contends that she has sufficiently set forth claims for hostile work environment, disparate treatment, retaliatory discharge and failure to hire based on sex.

## II.     Standard of Review

Under Rule 56 of the Federal Rules of Civil Procedure ("Rule"), summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)). *See also TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002). "As to materiality, the substantive law will identify which facts are material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* A genuine issue of material fact exists if the evidence would allow a reasonable jury to return a verdict for the non-moving party. *Id.* The court should view all facts and evidence in the light most favorable to the non-moving party. *United Fire & Cas. Co. v. Hixson Bros. Inc.*, 453 F.3d 283, 285 (5th Cir. 2006). Mere conclusory

allegations are insufficient to defeat summary judgment. *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996).

Although the Court is to consider the full record in ruling on a motion for summary judgment, Rule 56 does not obligate it to search for evidence to support a party's opposition to summary judgment. *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003) ("When evidence exists in the summary judgment record but the nonmovant fails even to refer to it in the response to the motion for summary judgment, that evidence is not properly before the district court."). Thus, the nonmoving party should "identify specific evidence in the record, and articulate" precisely how that evidence supports his or her claims. *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir.), *cert. denied*, 513 U.S. 871 (1994).

The nonmovant's burden of demonstrating a genuine issue is not satisfied merely by creating "some metaphysical doubt as to the material facts," "by conclusory allegations," by "unsubstantiated assertions," or "by only a scintilla of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). Rather a factual dispute precludes a grant of summary judgment only if the evidence is sufficient to permit a reasonable trier of fact to find for the nonmoving party. *Smith v. Amedisys*, 298 F.3d 434, 440 (5th Cir.2002).

### III. <u>Analysis</u>

#### A. <u>Unexhausted Claims</u>

KBR contends that, during Benson's deposition, Benson attempted to significantly broaden her claims well beyond the scope of her charges and her complaint to add: (i) an assertion that her manager harassed her with his managerial demands and tone of voice; (ii) a male coworker was retained a few days longer than she on the closing Waggaman Project; and (iii) KBR failed to hire her again in February 2017.

Benson finally contends that her testimony regarding the dismissal of the male coworker was not intended to expand her gender discrimination claim. Benson also contends that she was not required to amend her EEOC charge of May 2017 to include failure to hire because the investigation of the second charge would have uncovered the February 2017 failure to hire. Benson also contends that her complaint asserts facts sufficient to put KBR on notice of her claims of retaliatory failure to hire and that she exhausted the available administrative remedies for all three claims. Benson contends that she has not asserted a claim for managerial harassment, but that fact may be considered evidence of motive.

A Title VII cause of action may be based, not only upon the specific complaints made by the employee's initial EEOC charge, but also upon any kind of discrimination like or related to the charge's allegations, limited only by the scope of the EEOC investigation that could reasonably be expected to grow out of the initial charges of discrimination. *Fellows v. Universal Restaurants, Inc.,* 701 F.2d 447, 451 (5th Cir. 1983). Several courts in the Fifth Circuit have held that a plaintiff fails to exhaust his/her administrative remedies as to a particular claim if his charge does not contain the claim or make allegations giving rise to the claim. *See Oramous v. Military Dep't of Louisiana*, 2007 WL 2344921, at *2 (E.D. La. Aug. 15, 2007) (The court finding that, in addition to not checking the retaliation box on the charge form, there was "no mention of any retaliatory conduct in the particulars of the charge;" therefore, plaintiff failed to exhaust her administrative remedies as to her retaliation claim.); *McCray*, 942 F.Supp. at 294 ("McCray did not check the retaliation box on his EEOC charge, and the text of the charge does not refer to retaliation or contain any factual allegations to support a retaliation claim. This failure to exhaust administrative remedies bars McCray's retaliation claim in this lawsuit."); *May v. Fedex Freight Se., Inc.*, 649 F.Supp.2d 451, 456 (M.D.La.2009) ("The fact that plaintiff failed to check the box by 'Retaliation'

and make any other allegations of retaliation with respect to her discrimination claims confirms that she has failed to exhaust administrative remedies on this claim. A plethora of Fifth Circuit jurisprudence supports the Court's finding."); *see Lee v. Kroger Co.,* 901 F.Supp. 1218, 1224 (S.D. Tex. 1995) (where Plaintiff only checked the retaliation box and stated in the particulars of the charge: "I believe that I have been discriminated against in retaliation for filing two charges against the company in violation of Title VII . . ." and the court found that plaintiff only set forth an allegation of retaliation and, therefore, was precluded from maintaining additional claims of racial discrimination and harassment.).

The EEOC intake questionnaire in this case, dated December 26, 2015, indicates that Benson complained of sex discrimination arising out of an accusation of December 8, 2015 where Jim Borst ("Borst") Corporate Security for KBR questioned her on her possibly being romantically involved with her supervisor, Danny Geisinger. Rec. doc. 53-6, Exhibit 8. Benson also indicated that Hernando Cervantes and Fenwick Prentice were witnesses to the alleged discrimination. *Id.*

Benson alleges that the conversation with Borst quickly shifted to job duties that had nothing to do with her job; namely a "Forklift Daily Inspection." Rec. doc. 53-6, p. 30. Benson also notes that the relationship investigation occurred a few days after she requested a review of her employee file, which did not contain her medical records. Benson characterizes the missing medical records as a HIPAA violation. *Id.*

She also complains that KBR's investigation was a sham because documents that appeared were positioned on the back wall of the HSE trailer between the desks of two men most hostile to her, James Arledge and Tim Byrd, both HSE Inspectors. She indicated that the documents, though not KBR official, represented prohibited workplace conduct suggestive of what she was accused

of; *i.e.*, engaging in inappropriate relationships. The documents also included a threat "I'll get you before you get me." She complained that KBR did nothing about it.

Benson, thereafter, filed a second EEOC complaint, on May 29, 2017, alleging that the failure to hire her in December 2016 at the La Porte Project site was sex discrimination and retaliation. Specifically, Benson complained that she was hired by Guidry in December 2016 to relocate to Texas and after she did so, she was not given the job. Rec. doc. 46-26, p. 20. Benson stated that she was told that there was a reduction in force. *Id.* She stated, in her March 2016 complaint, that the denial of this opportunity was in retaliation for her having filed an earlier EEOC complaint and also that it was on the basis of her sex. *Id.*

In reviewing the substance of her complaint and whether the three claims are exhausted, the Court finds that they are not exhausted. While Benson's May 29, 2017 EEOC charge mentions hostile work environment through reference to her first EEOC complaint, review of the March 12, 2016 EEOC charge is practically devoid of any reference to a hostile work environment. While the Court notes Benson alluded of Arledge and Byrd being as two of the men most hostile to her in an addendum to her December 26, 2017 EEOC intake questionnaire, in the "Particulars" section of her March 12, 2016 charge Benson solely states, "I believe I have been discriminated against because of my sex, Female, and retaliated against in violation of Title VII of the Civil Rights Act of 1964, as amended." *See* R. Doc. 53-6, p. 30-31.

In addition, Benson also fails to reference her layoff in November 2016 and only complains of not receiving the job she was told she had been hired for and relocated for to Texas. Benson confirms that she has not alleged any claim for manager harassment. Thus, the only way the hostile environment claims and alleged failure to hire claims of November 2016 could survive is if they reasonably flow from the charges.

In *Elzey v. Catholic Charities*, 833 F. Supp. 2d. 595(5th Cir. 2011), the Fifth Circuit noted that nowhere in Plaintiff's one and only Charge of Discrimination did she allege facts which would give rise to a claim of sexual harassment or retaliation for complaining about sexual harassment. Indeed, Plaintiff's last sentence in the "Particulars" section of the Charge states: "I believe that I have been discriminated against because of my sex, female, in violation of Title VII of the Civil Rights Act of 1964, as amended."  The Court highlights that this statement contained no claim of sexual harassment or retaliation for complaining about such harassment, nor allegations which would give rise to such claims.

Several courts in the Fifth Circuit have held that a plaintiff fails to exhaust his/her administrative remedies as to a particular claim if his charge does not contain the claim or make allegations giving rise to the claim. *See, e.g., Oramous*, 2007 WL 2344921, at *2 (The court finding that, in addition to not checking the retaliation box on the charge form, there was "no mention of any retaliatory conduct in the particulars of the charge," and, therefore, plaintiff failed to exhaust her administrative remedies as to her retaliation claim.).

Like the Plaintiff in *Elzey*, Benson neither makes reference to her November 2016 retaliation claim in either charge, nor is there reference to a hostile environment in either charge. As such, neither of these claims are exhausted, and KBR is entitled to Summary Judgment as to those claims. Having determined that Benson admits that she has not made a claim for manager harassment, neither would she be allowed to use these statements as evidence.

### B.        Affairs as Sexual Harassment & Gender Based Name Calling

KBR next contends that Benson's claim that she was accused of engaging in romantic relationships with her direct supervisor and other employees, did not create a hostile environment.

KBR, however, further contends that the unfounded rumors and gossip do not rise to the level of sexual harassment as a matter of law.

Benson contends that the evidence of "affair talk" was motivated by her sex and evidence of names that her coworkers called her such as "whore", "slut" and "Queen B" are not merely offensive words and implicated the status of a woman. Rec. doc. 62-2, p. 9. Benson contends that the words of her coworkers were pervasive, because all of the men employed at the Waggaman site, even those outside of Benson's department, still knew about her allegedly sleeping with and engaging in inappropriate sexual relationships at the worksite. Rec. doc. 62-2.

Benson contends that the inference made all the more reasonable when widely known false accusations that she was having sex with multiple men on the job-site are taken into consideration. Benson contends that because Defendant attempts to blame the victim underscores the hostility of the environment. *Id.*

As further proof, Benson contends that evidence of the hostile environment is shown by the fact that two of the men (James Bell and Melvin Mobley), who were accused of having an affair with her, made their own allegations. She contends, however, their claims were not investigated. Finally, she contends that citing to the code of business conduct is not enough to render the environment not hostile.

To support such a claim of sexually hostile environment, a plaintiff must establish five elements: (1) that she belongs to a protected group; (2) that she was subjected to unwelcome harassment (3) based upon sex, (4) which affected a term, condition, or privilege of her employment; and (5) that her employer knew, or should have known, of the harassment and failed to take prompt remedial action. *See Jones v. Flagship International*, 793 F.2d 714, 719-20 (5th Cir. 1986).

The Supreme Court noted in *Faragher v. City of Boca Rotan,* 524 U.S. 775, 788 (1988) that "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." For example, the case law on when workplace behavior gives rise to a sexually hostile work environment claim shows a far greater degree of harassment than the record discloses here, both in terms of the frequency and the nature of the offensive conduct. *Compare Lauderdale v. Texas Dept. of Criminal Justice*, 512 F.3d 157, 163-64 (5th Cir. 2007) (finding pervasive harassment where plaintiff's supervisor telephoned her ten (10) to fifteen (15) times a night over a four-month period and many of the calls included sexual overtones and advances); *Thomas v. Willie G's Post Oak, Inc*., 2006 U.S. Dist. LEXIS 29906, 2006 WL 1117959 (S.D. Tex. April 25, 2006) (denying summary judgment where plaintiff's manager touched his buttocks twice and four (4) or five (5) times touched his arm muscles or rubbed his shoulders); *with Hockman*, 407 F.3d at 328 (holding that comments to plaintiff about another employee's body, slapping plaintiff on the behind with a newspaper, grabbing or brushing up against plaintiff's breasts and behind, and attempting to kiss plaintiff were not severe as a matter of law); *Jackson v. Kroger Co*., 2009 U.S. Dist. LEXIS 19048, 2009 WL 565514, at *5-6 (S.D. Tex. Mar. 5, 2009) (holding that supervisor's suggestive allusion to his penis size on one occasion and "roll[ing] up a piece of paper" and acting as if he were going to "spank" plaintiff on another occasion were insufficiently severe or pervasive as a matter of law).

In support of her claim that the environment was sexually hostile to her, Benson refers to affidavits from James Bell (her husband and Deputy Commissioning Manager of Waggaman Project), Melvin Mobley (Waggaman Project Principal Timekeeper), and Tim Bergdahl (Field Deputy Commission Manager). Mobley attests that he worked for KBR from February 2014 to November 2016. Each of these witnesses generally state that Benson was accused of being in

inappropriate relationships but neither of them identified the source of the rumor. Her husband denies that his relationship with her began while working for KBR and denied that it was inappropriate.

Bell indicates that he was accused of being in an inappropriate relationship with his now wife, but he also does not indicate who started the rumor. He simply denied the accusation and also states that management never investigated it. In her sur-reply, Plaintiff contends there is evidence that she was called at least one of these derogatory, gender specific names, when Defendant asked Plaintiff:

> Q: Do you recall at that meeting Tim Byrd telling you that he was trying to be friendly with you, when he called you Queen Bee, because he's a Beyoncé fan?

> A: No. Exhibit 3, excerpt from Angie Scott Benson Deposition.

Notably, according to Benson, counsel does not question her about what she recalls from the meeting regarding the other names she complained that her coworkers called her. Rec. doc. 85. Benson suggests that a reasonable person can infer that, if KBR acknowledges that a meeting took place at DYNO-Waggaman, during which one of Benson's coworkers tried to justify calling her "Queen B," that her statements as to the name-calling are true and implicate her sex. Benson contends that she was called "Queen B" and other derogatory names, the names targeted her and were because of her gender. Benson also contends that she complained about the name-calling, and the derogatory, gender-specific name-calling was pervasive enough to alter the conditions of her work on Defendant's DYNO-Waggaman project.

However, applying the caselaw, there is no allegation that any one made unwanted sexual advances toward Benson or request for sexual favors. Neither is their evidence of other verbal or physical conduct of a sexual nature that was unwelcomed in the sense that it is unsolicited and undesirable or offensive.

There is evidence in the form of an admission by Benson that she had two extramarital affairs with men she worked with who were managers. *See* Benson deposition, Rec. doc. 53-5, p. 216 & 219. She also admitted to accepting jewelry from other men and going to dinner with them. *Id.* Certainly, gossip about her prior acts of infidelity cannot be considered harassment.

Even if there were rumors about Benson and Bell or Benson and Mobley, there is no evidence of where these rumors started, and, as such, the rumors do not constitute sexual harassment. Art Thomas also admitted that there were rumors about others on the job, not just those about Benson and Bell. *See* Rec. doc. 53-15; s*ee also Jones v. Flagship Int'l,* 793 F.2d 714 (5th Cir. 1986) (unsupported fabricated rumors do not constitute sexual harassment.)

Accepting as true that Byrd tried to explain away why he called Benson "Queen B", even if harassing, it would not be severe and pervasive. There is no other evidence of the sexually or gender-based name calling Benson endured to a point which would render them pervasive. Consequently, Benson's claim based on rumors and gossip about her inappropriate relationships and gender-based name calling are dismissed.

1.  **Waggaman Claims: Retaliation, Investigation, Write-ups and HIPPA Complaint**

KBR contends that Benson alleges in her complaint that its investigation of her coworkers' hotline complaints of her purported affair with her manager was retaliatory. KBR also notes that after she filed her EEOC complaint she was written up for being late. KBR finally contends neither its investigation nor the write up constituted retaliation under Title VII.

Benson does not address the issue of whether these actions constituted retaliation. As to the retaliation claims, she primarily addresses the failure to hire and retaliatory discharge claims, which will be considered later in this opinion.

"A plaintiff establishes a prima facie case of retaliation by showing (i) [s]he engaged in a protected activity, (ii) an adverse employment action occurred, and (iii) there was a causal link between the protected activity and the adverse employment action." *Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 657 (5th Cir. 2012) (citing *Taylor v. United Parcel Serv., Inc.*, 554 F.3d 510, 523 (5th Cir. 2008)).

The Fifth Circuit has observed that "[e]very Court of Appeals to have considered this issue squarely has held that participation in an internal employer investigation not connected with a formal EEOC proceeding does not qualify as protected activity under the participation clause." *E.E.O.C. v. Rite Way Serv., Inc.,* 819 F.3d 235, 239 (5th Cir. 2016) (quoting *Townsend v. Benjamin Enters*., Inc., 679 F.3d 41, 49 (2d Cir. 2012)); *see also Byers v. Dall. Morning News, Inc*., 209 F.3d 419, 428 (5th Cir. 2000) (finding the participation clause "irrelevant" because the plaintiff had already been terminated by the time he filed his EEOC charge).

This Court is obliged by binding precedent to dismiss Benson's claim under the participation clause because her alleged protected activity was part of an internal employer investigation and not connected with a formal EEOC proceeding. Accordingly, Plaintiff's claim for retaliation under the participation clause is dismissed.

KBR notes Benson's one write-up for showing up late and the alleged non-compliance with the company's policy. KBR also noted that Benson said at most she should have received a verbal warning, and that it is insufficient to support a charge of discrimination. Benson does not address this issue.

However, in *DeHart v. Baker Hughes Oilfield Operation***,** 214 Fed. Appx. 437, 442 (5th Cir. Jan. 19, 2007) the Court held one write-up for gossiping is not enough to dissuade a reasonable worker from making or supporting a charge of discrimination. *See also Thibodeaux-Woody v.*

*Houston Cmty.Col.,* 593 F. App'x 280, 286 (5th Cir. 2014) (The Court holding that "written reprimand, without evidence of consequences, does not constitute an adverse employment action").

In this case, Benson, simply alleges that a policy was not complied with, but she fails to identify any consequence other than the write up which is not enough to constitute an adverse employment action. The evidence shows that she was allowed to pursue her complaints and she continued to work for KBR at Waggaman through the end of the project without demotion or reduction in pay. Benson Deposition, Rec. doc. 53-5, p. 46. There is no evidence in the record to establish that there was a connection between the December 2015 investigation or the written counseling on December 29, 2015, because Benson's complaint about the rumors stated they occurred in March 2016, after both.

KBR next contends that Benson's HIPAA complaint, while an internal complaint, is not actionable under Title VII. KBR points out that Benson cites to no evidence that someone knew that she had made a HIPAA violation complaint, which is not protected by Title VII. Rec. doc. 53-3, 10-11. KBR, therefore, contends that Benson's purported complaint to an unidentified "corporate" person that her HIPAA rights were violated does not constitute protected activity under Title VII. *Id.*

Benson generally alleges that she was retaliated against because she made a HIPAA complaint. She provides no support for the position that making a HIPAA complaint is protected by Title VII and would also constitute protected activity.

The EEOC in its interim enforcement guide points out that HIPAA's nondiscrimination provisions do not prohibit discrimination that is based on race, sex, or any other Title VII basis.[2]

---

[2] https://www.eeoc.gov/eeoc/foia/letters/2001/titlevii_ada_insurance_benefits.html

It further notes that while HIPAA's nondiscrimination provisions do prohibit discrimination that is based on specified health factors, including disability, the interim final rules make clear that HIPAA's nondiscrimination provisions focus, primarily, on ensuring access to insurance. *Id.* HIPAA does not consider personnel files and records, such as what Benson complains about, Protected Health Information (PHI). Thus, even if the records contain information about the employee's health, HIPAA does not apply, and nor does disclosure violate Title VII. Therefore, complaining of a possible HIPAA violation it is not a "protected activity" as defined by 42 U.S.C. 2000e-3(a).

Benson's only option if she believed KBR violated HIPAA was to make a written complaint with the Health and Human Services ("Secretary"). *See* 42 U.S.C. § 1320d–5(a)(1), 45 C.F.R. § 160.306; *see also Johnson v. Kuehne*, 2012 WL 1022939, at *5 ("Plaintiff's only redress for an alleged HIPAA violation is to lodge a written complaint with the Secretary of Health and Human Services."). Therefore, to the degree to which Benson contends that KBR retaliated against her because she complained a few days earlier about a HIPAA violation regarding the inadequate protection of her prescriptive medication list, that complaint was not a protected activity. Therefore, Benson's retaliation claim based on a HIPAA violation fails.

2. **LaPorte Claims- Failure to Hire, Gender Discrimination and Retaliation**

KBR contends that Benson's claims for KBR's failure to hire her in December 2016 on the LaPorte Project as an HSE inspector for the commissioning team was not discriminatory against her gender. KBR contends further that its decision also does not constitute retaliation for her March 2016 EEOC charge. KBR finally contends that Benson cannot establish that its failure to hire her was because of her sex.

Benson contends that she has presented prima facie evidence showing her entitlement to relief for KBR's retaliatory failure to hire and disparate treatment based on sex. Rec. doc. 62-2. Benson contends that the second time KBR refused to place her in the HSE Commissioning position at the La Porte site violated the company's practice because KBR routinely allowed managers in the field to hire who they wanted to hire. *Id.* She contends that this is how she got her position at the DYNO-Waggaman site. Benson believed that she had the job before completing the hire paperwork at the site, and that completion of an online application for the second opening was not a prerequisite for her being eligible for consideration. Benson further contends that the reason KBR gave for not hiring her a second time is pretext for discrimination.

Title VII makes it unlawful for an employer to discriminate against an employee who has opposed an employment practice made unlawful by Title VII or has made a charge under Title VII. 42 U.S.C. § 2000e-3(a). To establish a claim for discriminatory failure to hire, a plaintiff must demonstrate that: (1) she was in the protected class; (2) she applied for and was qualified for the position sought; (3) she was not selected; and, (4) after her rejection, another applicant not from the protected class was hired. *Haas v. Advo Sys., Inc.,* 168 F.3d 732, 733 (5th Cir.1999). Once the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate reason for the employment action. *Shirley v. Chrysler First, Inc.,* 970 F.3d 39, 42 (5th Cir.1992). If the defendant makes this showing, the burden shifts back to the plaintiff to prove that the asserted reason is a pretext for retaliation. *Id.*

**a.   La Porte Failure to Hire and Retaliation: December 9, 2016- New HSE Inspector Position.**

The evidence of record confirms that Guidry, the Commissioning Team Manager, worked for a brief period with Benson at the Waggaman Project site. He had the authority to hire

employees to perform commissioning work. Tom Guidry Deposition, Rec. doc. 53-14, p. 65. Guidry testified that he wanted to hire Benson because he knew her, and he was looking for a seamless fix. Although he wanted to hire her, Guidry admitted in his deposition that he mistakenly believed that Benson did not have to follow the hire-in requirements.

On December 9, 2016, Benson showed up at the INEOS Project site and told Nestor Soto, the HR Representative, that Guidry had hired her for a position. Mr. Soto reminded Guidry that he still did not have a requisition form for an open position for her. Rec. doc. 53-13, p. 3. It was then that the requisition for the HSE Inspector position, which Guidry refers to as a CSS- Safety Coordinator, was completed. Rec. doc. 53-13, Exhibit D. John Carson actually completed a requisition form for an HSE Inspector position on November 29, 2016, and not a CSS-Safety Coordinator position as Guidry indicated in his affidavit and testimony. *See* Requisition, Rec. doc. 53-10, p. 98. There is no evidence that a CSS-Safety Coordinator requisition was ever completed. Nevertheless, the intended purpose of the position was to hire an individual who would go through and mark out a plan identifying the locations where the commissioning team was going to work. *Id.*

Shortly thereafter, Guidry spoke with the HSE Director, Keith Kluger, who joined KBR in October 2016 and who had oversight of INEOS Project.[3] Kluger advised Guidry that the function of the proposed position was wholly HSE, and not commissioning, and, therefore, Guidry could not requisition for the position. Rec. doc. 53-13. Kluger further explained that all HSE personnel must functionally report to HSE management. *Id.* While the requisition was ultimately cancelled, Kluger inquired of Guidry about the specific job duties, which Kluger found to be the responsibility

---

[3] Benson contends that the Court should not consider Declaration of Janet Curfman (Rec. doc. 53-9) and Keith Kluger's Affidavit (Rec. doc. 53-12), because they were not produced in discovery. In considering the issue, neither of these matters were brought to the Court's attention during the pretrial phase of the case.

of KBR site HSE team and not a true SIMOPS/Commissioning job. Rec. doc. 53-12, p.3. It was then that Benson formally applied for the HSE Inspector position on December 14, 2016. *See* Ex. C-13, Rec. doc. 85.1; *see also* Rec. doc. 53-17, p. 51. Kluger also advised that Benson would have to go through review of experience, approvals, and interview just as anybody else. Kluger Affidavit, Rec. doc. 53-13. Consequently, Guidry's desire to hire Benson to work under him was simply not possible. *Id.*

Guidry later advised Benson that he did not believe that what he wanted to do would work because she was not qualified for any openings for commissioning jobs. *Id.* There is no evidence that the CSS SIMOPS Safety Coordinator position was ever posted or filled. In fact, the evidence shows the HSE Inspector position, although requisitioned, was ultimately cancelled and never filled. Instead and around the same time as Guidry's inquiry, Kluger had authorized his team to hire Jason McCaskill as an HSE Inspector Manager, which included commissioning work but reported to HSE and not CSS. *Id.*

There also is no evidence that an HSE CSS Inspector position ever existed at KBR. Benson admitted that when she was on the Pascagoula project that there was no Commissioning HSE Inspector position. Benson deposition, Rec. doc. 53-5, p. 80. Benson also confirmed that there was no KBR HSE Commissioning person on the Waggaman project. The position never existed as envisioned by Guidry and he sought to create a position to help his friend, Benson.

Therefore, while Benson was in a protected class, she applied for a position that never existed before and was being crafted outside of the regular channels for her by Guidry. Kluger, being responsible for HSE Inspectors, advised Guidry that Benson would have to apply through normal channels and would work in his department under Mr. Carethers.

Also, while her husband Mr. Bell attested in the affidavit that completing an application is not required, the evidence shows that 137 other people submitted applications for HSE nspector jobs at the La Porte site who were mostly men and rejected. Rec. doc. 53-10, p. 77-96. Benson mistakenly assumed that she was hired based on her conversation with Guidry, who denies telling her to move to Texas. Rec. doc. 53-13, p. 31-32.

After reviewing her resume, Kluger determined that Benson's experience was operations safety and the commissioning phase on the Waggaman Project. He determined that her experience was not much in the area of commissioning; so, on December 22, 2016, he notified HR that they would not be pursuing Benson, or the position, and the requisition was cancelled. Kluger Affidavit, Rec. doc. 53-12, p.3. Guidry testified that he considered her for a commissioning position as an HSE inspector because her resume could not actually justify her being hired as an actual commissioning coordinator. *Id.*

Guidry also stated that her resume was for safety and he thought he could help her out if he hired her as a "commissioning safety person." *Id.* He said he needed a commissioning safety person and that eventually, as she got more familiar with the activity, he could eventually work her into a commissioning position. *Id.* He testified that he could not at the time hire her directly as a commissioning coordinator. *Id.* Benson was not qualified for an HSE CSS Inspector position or an HSE Inspector assigned to commissioning even if it existed, which it did not. Having determined that Benson has not made a prima facia case of failure to hire, the Court further finds that no one else was ever hired for the HSE Commissioning Inspector / HSE Inspector position assigned to commissioning position that Guidry attempted to create for Benson. Therefore, KBR is entitled to dismissal of Benson's retaliation and failure to hire claim arising out of the December 9, 2019 HSE Inspector/HSE CSS Inspector Position.

### b.     La Porte Project: Disparate Treatment, and Gender Discrimination

Benson's retaliation claim also fails because there is no evidence before the Court that connects the KBR's failure to hire Benson for the non-existent HSE CSS Inspector position or the HSE Inspector position assigned to commissioning and her previous employment discrimination charge. *See Winchester v. Galveston Yacht Basin*, 943 F. Supp. 776, 780 (S.D.Tex.1996) (dismissing the plaintiff's retaliation claim because there was insufficient evidence to indicate a causal connection between her prior protected activity and the adverse employment action). *See also Turner v. Brownlee,* 2005 WL 119881, (E.D. La. 2005). Neither is there evidence that Kluger learned about her prior indiscretions having just joined the company in October 2016 in Texas, not Louisiana. As Benson fails to establish a causal link, Benson does not meet the third requirement to establish a prima facie case for retaliation. *Hernandez*, 670 F.3d 657.

Benson also contends that Jason McCaskill was hired for the position she applied for. However, the evidence shows that McCaskill was not hired for the HSE Inspector position. McCaskill was hired for the HSE Manager position and the hiring decision was made before Kluger had knowledge of Guidry's requisition for Benson. Affidavit Tom Guidry, Rec. doc. 53-12, p. 1-4. According to Kluger, while McCaskill coordinated with commissioning, he was not under Guidry's control or chain of command and nor was he subordinate to commissioning. Affidavit of Kluger 53-12, p.3. Benson even acknowledged that McCaskill had more HSE experience than she had. Benson Deposition, Rec. doc. 53-5, p. 164, lines 18-21.

It is undisputed that McCaskill was transferred from the KBR project he was working on as an HSE manager to a lead position on the La Porte Project. Keith Kluger Affidavit, Rec. doc. 53-23, p. 2. McCaskill performed HSE duties for thirty-plus (30+) years and his work ranged from performing as a safety inspector up to the safety manager. Jason McCaskill Affidavit, Rec. doc.

53-12, p. 1. McCaskill performed duties during the commissioning and pre-commissioning stages on several projects. He arrived in La Porte on January 11, 2017 and received a salary plus straight time for his time worked over forty (40) hours in a week. *Id.* He was not hired for the HSE Inspector position or the HSE CSS Inspector position sought by Benson.

In contrast, Benson worked previously only as an HSE Inspector. While her resume alludes to her being a supervisor, KBR's employment documentation clearly shows that she has always worked as an HSE Inspector and worked on an hourly basis at a rate of beginning at $27 and ended at a rate of $32, the same rate paid to other HSE Inspectors. *See, e.g.*, Benson Resume, Rec. doc. 53-12; Benson Personnel Action Notice, Rec. doc. 53-10 dated 04/19/2015; HSE Inspector Pay Rates, R. Doc. 53-10, p. 68. Also, she worked for KBR for three years. Benson was not qualified to work in commissioning but even if he had been, McCaskill's qualifications were unmatched. As such, Benson's claim for disparate impact and gender discrimination fail.

## IV.    Conclusion

Accordingly,

 **IS ORDERED** that Defendant **KBR, Inc.'s Motion for Summary Judgment (R. Doc. 53)** is **GRANTED.**

New Orleans, Louisiana, this  12th  day of November, 2019

_____
**KAREN WELLS ROBY**
**UNITED STATES MAGISTRATE JUDGE**